**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 12-1100 (and consolidated cases)**

————————

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————

WHITE STALLION ENERGY CENTER, LLC, et al.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents.*

————————

**On Petition for Review of Final Agency Action**
**77 FR 9304 (Feb. 16, 2012)**

————————

**JOINT REPLY BRIEF OF STATE, INDUSTRY, AND LABOR**
**PETITIONERS**

————————

| | |
|---|---|
| F. William Brownell | Bill Schuette |
| Lauren E. Freeman | ATTORNEY GENERAL |
| Lee B. Zeugin | John J. Bursch |
| Elizabeth L. Horner | Solicitor General |
| HUNTON & WILLIAMS LLP | S. Peter Manning |
| 2200 Pennsylvania Avenue, N.W. | Neil D. Gordon |
| Washington, D.C. 20037 | Brian J. Negele |
| (202) 955-1500 | Assistant Attorneys General |
| bbrownell@hunton.com | Environment, Natural Resources, and |
| lfreeman@hunton.com | Agriculture Division |
| lzeugin@hunton.com | Office of the Attorney General of |
| ehorner@hunton.com | Michigan |
| | 525 W. Ottawa Street |
| *Counsel for Utility Air Regulatory* | P.O. Box 30755 |
| *Group* | Lansing, MI 48909 |
| | (517) 373-7540 |
| | manningp@michigan.gov |
| | gordonnl@michigan.gov |
| | negeleb@michigan.gov |
| **DATED:  March 25, 2013** | *Counsel for the State of Michigan* |
| **Final Form:  April 8, 2013** | |

*Additional counsel listed on following pages*

## Additional Counsel

Peter S. Glaser
George Y. Sugiyama
TROUTMAN SANDERS LLP
401 Ninth Street, N.W.
Suite 1000
Washington, D.C. 20004
(202) 274-2998
peter.glaser@troutmansanders.com

*Counsel for National Mining
Association*

David B. Rivkin, Jr.
Lee A. Casey
Mark W. DeLaquil
Andrew M. Grossman
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
(202) 861-1500
drivkin@bakerlaw.com
lcasey@bakerlaw.com
mdelaquil@bakerlaw.com
agrossman@bakerlaw.com

*Counsel for National Black Chamber of
Commerce and Institute for Liberty*

Luther Strange
ATTORNEY GENERAL
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7445

*Counsel for the State of Alabama*

Michael C. Geraghty
ATTORNEY GENERAL
Steven E. Mulder
State of Alaska
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501-1994

*Counsel for the State of Alaska*

David M. Flannery
Gale Lea Rubrecht
Kathy G. Beckett
Edward L. Kropp
JACKSON KELLY PLLC
500 Lee Street, East, Suite 1600
P.O. Box 553
Charleston, WV 25322-0553
(304) 340-1000
dmflannery@jacksonkelly.com
galelea@jacksonkelly.com
kbeckett@jacksonkelly.com
skropp@jacksonkelly.com

*Counsel for Midwest Ozone Group*

Leslie Sue Ritts
RITTS LAW GROUP, PLLC
The Carriage House
620 Fort Williams Parkway
Alexandria, VA 22304
(703) 823-2292
LSRitts@rittslawgroup.com

*Counsel for American Public Power
Association*

Thomas Horne
ARIZONA ATTORNEY GENERAL
Joseph P. Mikitish
James T. Skardon
Assistant Attorneys General
Environmental Enforcement Section
1275 West Washington
Phoenix, AZ 85007
(602) 542-8553
Joseph.mikitish@azag.gov

*Counsel for the State of Arizona*

Dustin McDaniel
ARKANSAS ATTORNEY GENERAL
Kendra Akin Jones
Assistant Attorney General
Charles L. Moulton
Senior Assistant Attorney General
Arkansas Attorney General
323 Center Street, Suite 400
Little Rock, AR 72201
(501) 682-2007
kendra.jones@arkansasag.gov
charles.moulton@arkansasag.gov

*Counsel for the State of Arkansas, ex
rel. Dustin McDaniel, Attorney General*

Peter S. Glaser
George Y. Sugiyama
TROUTMAN SANDERS LLP
401 Ninth Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 274-2998
peter.glaser@troutmansanders.com

*Counsel for Peabody Energy
Corporation*

Pamela Jo Bondi
ATTORNEY GENERAL OF FLORIDA
Jonathan A. Glogau
The Capitol, PL-01
Tallahassee, FL 32399-1050

*Counsel for the State of Florida*

David M. Flannery
Gale Lea Rubrecht
Kathy G. Beckett
Edward L. Kropp
JACKSON KELLY PLLC
500 Lee Street, East, Suite 1600
P.O. Box 553
Charleston, WV 25322-0553
(304) 340-1000
dmflannery@jacksonkelly.com
galelea@jacksonkelly.com
kbeckett@jacksonkelly.com
skropp@jacksonkelly.com

*Counsel for West Virginia Chamber of
Commerce, Inc., Georgia Association of
Manufacturers, Inc., Indiana Chamber
of Commerce, Inc., Indiana Coal
Council, Inc., Kentucky Chamber of
Commerce, Inc., Kentucky Coal
Association, Inc., North Carolina
Chamber, Ohio Chamber of Commerce,
Pennsylvania Coal Association, South
Carolina Chamber of Commerce, The
Virginia Chamber of Commerce, The
Virginia Coal Association,
Incorporated, West Virginia Coal
Association, Inc., and Wisconsin
Industrial Energy Group, Inc.*

Lawrence G. Wasden
IDAHO ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720-0010

*Counsel for the State of Idaho*

Grant Crandall
Arthur Traynor, III
UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Suite 200
Triangle, VA 22172
(703) 291-2457
gcrandall@umwa.org
atraynor@umwa.org

Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 47
Glenwood, MD 21738
(301) 639-5238
emtrisko@earthlink.net

*Counsel for United Mine Workers of
America*

Gregory F. Zoeller
INDIANA ATTORNEY GENERAL
Valerie Tachtiris
Deputy Attorney General
Office of the Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204
(317) 232-6290
Valerie.Tachtiris@atg.in.gov

*Counsel for the State of Indiana*

Dennis Lane
STINSON MORRISON HECKER LLP
1775 Pennsylvania Ave., N.W.
Suite 800
Washington, D.C. 20006-4605
(202) 785-9100
dlane@stinson.com

Parthenia B. Evans
STINSON MORRISON HECKER LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 842-8600
pevans@stinson.com

*Counsel for Kansas City Board of Public Utilities*

Derek Schmidt
ATTORNEY GENERAL OF KANSAS
Jeffrey A. Chanay
Deputy Attorney General, Civil
Litigation Division
Office of the Attorney General of
Kansas
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
(785) 368-8435
jeff.chanay@ksag.org

Henry V. Nickel
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500
hnickel@hunton.com

George P. Sibley, III
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA  23221
(804) 788-8200
gsibley@hunton.com

*Counsel for the State of Kansas*

Eric A. Groten
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568
(512) 542-8709
egroten@velaw.com

Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037-1701
(202) 639-6507
jmarwell@velaw.com

*Counsel for White Stallion Energy
Center, LLC*

John A. Riley
Christopher C. Thiele
BRACEWELL & GIULIANI LLP
111 Congress Avenue, Suite 2300
Austin, TX 78701-4061
(512) 542-2108
john.riley@bgllp.com
chris.thiele@bgllp.com

*Counsel for Chase Power Development,
LLC*

Harold E. Pizzetta III
ASSISTANT ATTORNEY GENERAL
Director, Civil Litigation Division
550 High Street, Suite 1100
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3816
hpizz@ago.state.ms.us

*Counsel for the State of Mississippi*

Chris Koster
ATTORNEY GENERAL
James R. Layton
John K. McManus
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800
James.Layton@ago.mo.gov

*Counsel for the State of Missouri*

Paul D. Clement
Nathan A. Sales
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090
pclement@bancroftpllc.com
nsales@bancroftpllc.com

*Counsel for FirstEnergy Generation
Corporation*

Lisa Marie Jaeger
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, D.C. 20006-1872
(202) 828-5800
lisa.jaeger@bgllp.com

*Counsel for Edgecombe Genco, LLC
and Spruance Genco, LLC*

Jon Bruning
ATTORNEY GENERAL OF THE STATE OF
NEBRASKA
Katherine J. Spohn
Deputy Attorney General
2115 State Capitol
PO Box 98920
Lincoln, NE 68509
(402) 471-2682
Katie.spohn@nebraska.gov

*Counsel for the State of Nebraska*

Wayne Stenehjem
ATTORNEY GENERAL
State of North Dakota
Margaret I. Olson
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
(701) 328-3640
maiolson@nd.gov

*Counsel for the State of North Dakota*

Steven C. Kohl
Eugene E. Smary
Sarah C. Lindsey
WARNER NORCROSS & JUDD LLP
2000 Town Center, Suite 2700
Southfield, MI 48075-1318
(248) 784-5000
skohl@wnj.com

*Counsel for Wolverine Power Supply
Cooperative, Inc.*

E. Scott Pruitt
OKLAHOMA ATTORNEY GENERAL
P. Clayton Eubanks
Deputy Solicitor General
Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK  73105
(405) 522-8992
fc.docket@oag.ok.gov
clayton.eubanks@oag.ok.gov

*Counsel for the State of Oklahoma*

Michael DeWine
ATTORNEY GENERAL OF OHIO
Dale T. Vitale
Gregg H. Bachmann
Cameron F. Simmons
Assistant Attorneys General
Environmental Enforcement Section
30 E. Broad St., 25th Floor
Columbus, OH 43215-3400
(614) 466-2766
dale.vitale@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

James D. Schultz
GENERAL COUNSEL
Gregory E. Dunlap
Executive Deputy General Counsel
Robert M. Wolff
Special Counsel
Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA  17101
(717) 783-6563

*Counsel for the Commonwealth of
Pennsylvania*

Alan Wilson
ATTORNEY GENERAL
James Emory Smith, Jr.
Assistant Deputy Attorney General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
(803) 734-3680
agesmith@scag.gov

*Counsel for the State of South Carolina*

Greg Abbott
ATTORNEY GENERAL OF TEXAS
Daniel T. Hodge
First Assistant Attorney General
John B. Scott
Deputy Attorney General for Civil
Litigation
Jon Niermann
Chief, Environmental Protection
Division
Mark Walters
Assistant Attorney General
Mary E. Smith
Assistant Attorney General
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2012
mark.walters@texasattorneygeneral.gov
mary.smith@texasattorneygeneral.gov

*Counsel for the State of Texas, Texas Commission on Environmental Quality, Texas Public Utility Commission, and Railroad Commission of Texas*

Mark L. Shurtleff
UTAH ATTORNEY GENERAL
350 North State Street, #230
Salt Lake City, UT 84114-2320
(801) 538-1191

*Counsel for the State of Utah*

Kenneth T. Cuccinelli, II
ATTORNEY GENERAL OF VIRGINIA
900 East Main Street
Richmond, VA 23219
(804) 786-7240

*Counsel for the Commonwealth of Virginia*

Patrick Morrisey
ATTORNEY GENERAL OF WEST VIRGINIA
Silas B. Taylor
Senior Deputy Attorney General
Office of the West Virginia Attorney
General
State Capitol, Room 26-E
Charleston, WV  25305
(304) 558-2021
sbt@wvago.gov

*Counsel for the State of West Virginia*

Brenna Findley
1007 East Grand Avenue
Des Moines, IA  50319
brenna.findley@iowa.gov

*Counsel for Terry E. Branstad,*
*Governor of the State of Iowa on behalf*
*of the People of Iowa*

Jeffrey R. Holmstead
Sandra Y. Snyder
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, D.C.  20006-1872
(202) 828-5800
jeffrey.holmstead@bgllp.com
sandra.snyder@bgllp.com

*Counsel for Tri-State Generation and*
*Transmission Association, Inc.*

Gregory A. Phillips
WYOMING ATTORNEY GENERAL
Jay A. Jerde
Wyoming Deputy Attorney General
Office of the Attorney General of
Wyoming
123 State Capitol
Cheyenne, WY  82002
(307) 777-7841
jay.jerde@wyo.gov

*Counsel for the State of Wyoming*

Jack Conway
ATTORNEY GENERAL OF KENTUCKY
Commonwealth of Kentucky
700 Capital Avenue, Suite 118
Frankfort, KY 40601

*Counsel for Jack Conway, Attorney*
*General of Kentucky*

Bart E. Cassidy
Katherine L. Vaccaro
MANKO, GOLD, KATCHER & FOX, LLP
401 City Avenue, Suite 500
Bala Cynwyd, PA  19004
(484) 430-5700
bcassidy@mgkflaw.com
kvaccaro@mgkflaw.com

*Counsel for ARIPPA*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................i

TABLE OF AUTHORITIES ......................................................... iii

GLOSSARY OF TERMS ..............................................................ix

SUMMARY OF ARGUMENT .........................................................1

ARGUMENT ...............................................................................2

I.    EPA's EGU MACT Standards Are Unlawful Under §112(n)(1)(A). ...............................................................2

    A.    Section 112(n)(1)(A) Limits Regulation of EGUs to Those HAP Emissions Posing Public Health Hazards, and Then Only as "Necessary" and "Appropriate."...........................2

        1.    EPA's New Approach to EGU HAP Regulation.......................3

        2.    Example of EPA's Regulatory Overreach: HCl Emissions. ........................................................4

        3.    EPA's New Regulatory Approach Turns §112(n)(1)(A) on Its Head. ........................................6

            a)    EPA Unlawfully Failed to Apply the §112(n)(1)(A) Decisional Criteria. ...................6

            b)    EPA Unlawfully Rejected "Public Health Hazards" as the Sole Trigger for EGU Regulation. ..................................................9

            c)    EPA Violated §112(n)(1)(A) by Not Limiting EGU HAP Regulation to Only Those HAP Emissions Found to Pose a Health Hazard....................11

            d)    EPA Erred by Not Considering Costs in Determining the "Appropriate" Degree of Regulation....................................................14

i

4.    *New Jersey* Does Not Bar or Resolve Any of
Petitioners' §112(n)(1)(A) Objections or Challenges
to the Lawfulness of EPA's §112(d) Regulation. ......................16

B.    EPA's "Appropriate and Necessary" Determination Lacks
Record Basis. ....................................................................................17

1.    The Record Does Not Establish That Residual EGU
Mercury Emissions Create a Health Hazard. .............................17

2.    Non-Mercury Metals Do Not Pose a Health Hazard. ..............19

3.    HCI Emissions Do Not Pose a Health or
Environmental Hazard. .............................................................22

II.    Assuming EPA Was Compelled To Establish EGU Standards
Under §112(d), the MATS Rule Must Be Vacated Because EPA
Failed to Distinguish Between Major and Area Sources. ............................24

III.   Assuming §112(c) and (d) Govern Regulation of EGU HAP
Emissions, EPA's MACT Standards Are Unlawful. .....................................28

A.    EPA's Mercury MACT Limits Are Arbitrary and
Capricious. ..........................................................................................28

B.    EPA's Decision Not to Set §112(d)(4) Standards Is
Arbitrary and Capricious. ...................................................................30

C.    EPA's Denial of UARG's Delisting Petition Lacks Basis. ................31

CONCLUSION ...............................................................................................33

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001) ...........................8

\* *Desert Citizens Against Pollution v. EPA*, 699 F.3d 524 (D.C. Cir. 2012) .................................................................................................13

\* *Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995) ...........................10

*Madison Gas & Elec. Co. v. EPA*, 25 F.3d 526 (7th Cir. 1994)..............................21

\* *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) .........................................14, 15

*National Asphalt Pavement Ass'n v. Train*, 539 F.2d 775 (D.C. Cir. 1976) .................................................................................................17

*National Lime Ass'n v. EPA*, 627 F.2d 416 (D.C. Cir. 1980).................................21

*National Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000).................2, 13, 24, 27

*New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008) .....................................2, 16, 17

*NRDC v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) ......................................................19

*NRDC v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007) ................................................25, 31

*NRDC v. EPA*, 529 F.3d 1077 (D.C. Cir. 2008) .....................................................20

*Russello v. United States*, 464 U.S. 16 (1983)........................................................11

*Sierra Club v. Gorsuch*, 715 F.2d 653 (D.C. Cir. 1983) ........................................22

*Thomas v. New York*, 802 F.2d 1443 (D.C. Cir. 1986)............................................17

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ............................................7

## FEDERAL STATUTES

Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq*.

CAA § 111, 42 U.S.C. § 7411 ....................................................................17

CAA § 112, 42 U.S.C. § 7412 ..................................... 1, 2, 4, 5, 6, 7, 8, 9, 11,
.............................................................................. 12, 15, 17, 20, 24, 27, 31

CAA § 112(a), 42 U.S.C. § 7412(a) .....................................................24, 26

CAA § 112(a)(8), 42 U.S.C. § 7412(a)(8)....................................................26

CAA § 112(b)(2), 42 U.S.C. § 7412(b)(2) .................................................9, 10

CAA § 112(c), 42 U.S.C. § 7412(c) ......................... 2, 13, 15, 16, 25, 26, 27

CAA § 112(c)(1), 42 U.S.C. § 7412(c)(1)...............................................16, 24

CAA § 112(c)(3), 42 U.S.C. § 7412(c)(3).................................12, 24, 26, 27

CAA § 112(c)(6), 42 U.S.C. § 7412(c)(6)....................................................13

CAA § 112(c)(9), 42 U.S.C. § 7412(c)(9)................................15, 16, 31, 32

CAA § 112(d), 42 U.S.C. § 7412(d)............................. 1, 2, 3, 6, 7, 8,  9, 12,
.............................................................................. 14, 16, 17, 24, 25, 26, 27

CAA § 112(d)(1), 42 U.S.C. § 7412(d)(1) .......................................11, 12, 13

CAA § 112(d)(2), 42 U.S.C. § 7412(d)(2) .......................................13, 15, 27

CAA § 112(d)(3), 42 U.S.C. § 7412(d)(3) ....................................................28

CAA § 112(d)(4), 42 U.S.C. § 7412(d)(4) ...............................................30, 31

CAA § 112(d)(5), 42 U.S.C. § 7412(d)(5) ....................................................24

CAA § 112(e)(2)(A), 42 U.S.C. § 7412(e)(2)(A) ...................................9, 10

CAA § 112(f), 42 U.S.C. § 7412(f)...........................................6, 7, 8, 20

CAA § 112(m), 42 U.S.C. § 7412(m) ....................................................7, 8, 9

CAA § 112(m)(6), 42 U.S.C. § 7412(m)(6) .............................................7, 10

CAA § 112(n), 42 U.S.C. § 7412(n)........................................8, 9, 14, 22, 27

CAA § 112(n)(1)(A), 42 U.S.C. § 7412(n)(1)(A) ......... 1, 2, 3, 4, 5, 6, 7, 8, 9,
...................................................................................... 10, 11, 12, 13, 14, 15,
...................................................................................... 16, 17, 20, 25, 26, 27

CAA § 112(n)(5), 42 U.S.C. § 7412(n)(5) .............................................9, 10

CAA § 112(n)(6), 42 U.S.C. § 7412(n)(6) .............................................9, 10

CAA § 307(d), 42 U.S.C. § 7607(d)...............................................1, 8, 14, 22

CAA § 307(d)(1)(C), 42 U.S.C. § 7607(d)(1)(C) ...............................8, 9, 14

CAA § 307(d)(2)-(6), 42 U.S.C. § 7607(d)(2)-(6) .........................................8

CAA § 401, 42 U.S.C. § 7651 .........................................................................5

## LEGISLATIVE HISTORY

136 Cong. Rec. H12934 (daily ed. Oct. 26, 1990) (statement of Rep.
      Oxley), *reprinted in* 1 A LEGISLATIVE HISTORY OF THE CLEAN
      AIR ACT AMENDMENTS OF 1990 at 1416 (1998) ...........................................11

## FEDERAL REGISTER

65 Fed. Reg. 79825 (Dec. 20, 2000) ..........................................................3, 5, 17, 31

69 Fed. Reg. 4652 (Jan. 30, 2004) ...........................................................................5

70 Fed. Reg. 15994 (Mar. 29, 2005)................................................3, 5, 11, 15, 18

76 Fed. Reg. 24976 (May 3, 2011) ...................................................3, 5, 10, 18, 23

77 Fed. Reg. 9304 (Feb. 16, 2012) ...........................................................10, 27, 32

## MISCELLANEOUS

EPA, MACT Floor Analysis (Dec. 16, 2011), EPA-HQ-OAR-2009-
        0234-20132 ("MACT Floor Analysis") .......................................................25

EPA, Memorandum from Madeleine Strum, *et al.*, to Docket EPA-
        HQ-OAR-2009-0234, Non-Hg Case Study Chronic Inhalation
        Risk Assessment for the Utility MACT Appropriate and
        Necessary Analysis (Mar. 16, 2011), EPA-HQ-OAR-2009-
        0234-2939 ("16-Plant Study")................................................................19, 20

EPA, National Emission Standards for Hazardous Air Pollutants for
        Coal- and Oil-Fired Electric Utility Steam Generating Units;
        Response to Comments Received on Proposed Information
        Collection Request (Published on July 02, 2009; 74 FR 31725)
        (Nov. 5, 2009), EPA-HQ-OAR-2009-0234-0063 ........................................28

EPA, Regulatory Impact Analysis for the Final Mercury and Air
        Toxics Standards (Dec. 2011), EPA-HQ-OAR-2009-0234-
        20131 ("RIA") .............................................................................................19

EPA, Study of Hazardous Air Pollutant Emissions from Electric
    Utility Steam Generating Units—Final Report to Congress,
    Vol. 1 (Feb. 1998), EPA-HQ-OAR-2009-0234-3052 ("Utility
    Study")....................................................................................................5

EPA, Supplement to the Non-Hg Case Study Chronic Inhalation Risk
    Assessment in Support of the Appropriate and Necessary
    Finding for Coal- and Oil-Fired Electric Generating Units
    (Nov. 2011), EPA-HQ-OAR-2009-0234-19912..........................................19

EPA, Toxicity Assessment,
    www.epa.gov/region8/r8risk/hh_toxicity.html .............................................18

EPRI, Comments on Proposed HAPs MACT Rule (Aug. 4, 2011),
    EPA-HQ-OAR-2009-0234-17621 ("EPRI Comments") ......................23, 25

EPRI, Updated Hazardous Air Pollutants (HAPs) Emissions Estimates
    and Inhalation Human Health Risk Assessment for Coal-Fired
    Electric Generating Units, No. 1017980 (Dec. 2009, Mar. 2011
    revision), EPA-HQ-OAR-2009-0234-16738 .................................................30

Final Br. of Resp't EPA, New Jersey v. EPA, No. 05-1097 (D.C. Cir.
    July 23, 2007) .............................................................................................11

Southern Company, Comments on EPA's Proposed National
    Emission Standards for Hazardous Air Pollutants from Coal-
    and Oil-Fired Electric Utility Steam Generating Units; 76 Fed.
    Reg. 24976 (May 3, 2011) (Aug. 4, 2011), EPA-HQ-OAR-
    2009-0234-18023 ("Southern Comments") .................................................30

UARG, Comments on National Emission Standards for Hazardous
    Air Pollutants From Coal- and Oil-Fired Electric Utility Steam
    Generating Units: Proposed Rule (Aug. 4, 2011), EPA-HQ-
    OAR-2009-0234-17775 ("UARG Comments")...................20, 21, 29, 30, 31

UARG, Petition for the De-Listing of Coal-Fired Electric Utility
    Steam Generating Units as a Source Category Subject to
    Section 112 of the Clean Air Act (Aug. 4, 2011), EPA-HQ-
    OAR-2009-0234-177777 ("De-Listing Petition") .........................................32

UARG, Petition for Reconsideration of EPA's National Emission
        Standards for Hazardous Air Pollutants From Coal- and Oil-
        fired Electric Utility Steam Generating Units:  Proposed Rule
        (Apr. 16, 2012), EPA-HQ-OAR-2009-0234-20179
        ("Reconsideration Petition") ........................................................................22

# GLOSSARY OF TERMS

| | |
|---|---|
| ACI | Activated Carbon Injection |
| Act | Clean Air Act |
| CAA | Clean Air Act |
| EGUs | Electric Utility Steam Generating Units |
| EPA | U.S. Environmental Protection Agency |
| GACT | Generally Available Control Technology |
| HAP | Hazardous Air Pollutant |
| HCl | Hydrogen Chloride |
| Hg | Mercury |
| ICR | Information Collection Request |
| JA | Joint Appendix |
| MACT | Maximum Achievable Control Technology |
| MATS | Mercury and Air Toxics Standards |
| OMB | Office of Management and Budget |
| RfC | Reference Concentration |
| RfD | Reference Dose |
| RIA | Regulatory Impact Analysis |
| TSD | Technical Support Document |

ix

UARG                    Utility Air Regulatory Group

# SUMMARY OF ARGUMENT

Petitioners' challenge to the mercury and air toxics standards ("MATS") rule is grounded in the language of Clean Air Act ("CAA") §112(n)(1)(A) and the U.S. Environmental Protection Agency's ("EPA") contemporaneous interpretations of that provision. As reflected in prior rulemaking, electric utility steam generating units ("EGUs") cannot be regulated under §112 unless the Administrator finds, following §307(d) notice-and-comment rulemaking and considering the results of a study focused exclusively on "hazards to public health," that regulation of EGU hazardous air pollutant ("HAP") emissions is "necessary" and "appropriate." If a HAP emitted by EGUs poses no public health hazard (e.g., acid gases) or if HAP emissions from a large segment of the EGU source category pose no public health hazard (e.g., non-mercury metals), regulation of those emissions cannot be "necessary." For any emissions posing a health hazard, EPA must consider additional factors, including cost, to determine whether and to what degree regulation of that HAP is "appropriate and necessary" to address that hazard.

By contrast, EPA's MATS rule subjects all EGU HAP emissions to §112(d) maximum achievable control technology ("MACT") standards, even though EPA concedes that there are HAP emissions from EGUs that do not create any public health hazard. In fact, EPA concedes that EGU acid gas emissions are being regulated solely because of *environmental* effects, the precise kind of effects that

1

Congress addressed in the CAA's acid rain title (Title IV).

EPA argues that MACT regulation of EGU emissions posing no health hazard is compelled by §112(c) and (d) and this Court's decisions in *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008), and *National Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000). And while EPA cites the word "appropriate" to justify regulating emissions not identified as posing any health hazard, EPA finds no room in "appropriate" to consider cost, a factor considered in other §112 risk-based decisions. None of EPA's excuses and explanations for evading §112(n)(1)(A)'s rulemaking criteria withstand scrutiny.

## ARGUMENT

I.  **EPA'S EGU MACT STANDARDS ARE UNLAWFUL UNDER §112(n)(1)(A).**

A. **Section 112(n)(1)(A) Limits Regulation of EGUs to Those HAP Emissions Posing Public Health Hazards, and Then Only as "Necessary" and "Appropriate."**

Congress treated EGUs differently from other sources by making "appropriate and necessary" the guiding principle for *all* regulation of EGU HAP emissions. The plain language of §112(n)(1)(A) provides that to trigger regulation, EPA must identify EGU HAP emissions posing a health hazard, i.e., for which regulation is "necessary." Then, the Administrator shall regulate only to the *extent* she finds is "appropriate" and "necessary."

2

EPA overstepped its §112(n)(1)(A) authority by promulgating emission standards for *all* EGU HAP emissions, including those posing no health hazard. *See* EPA Br. 56-62.  Next, EPA exceeded that authority by setting §112(d) emission standards without evaluating whether, and the degree to which, those standards were "appropriate" for the EGU HAP emissions subject to the standard.

### 1.  EPA's New Approach to EGU HAP Regulation.

Prior to 2011, EPA recognized that an "appropriate and necessary" finding for EGU emissions of one HAP (such as mercury) did not automatically require regulation of all HAPs emitted by EGUs.  *See* 65 FR 79825, 79827/3 (Dec. 20, 2000) (EGUs listed for mercury alone, with other HAPs subject to future evaluation)(JA2615); 70 FR 15994, 16002/1-2 (Mar. 29, 2005) (mercury alone warrants consideration)(JA2691).

In 2011, EPA reinterpreted §112(n)(1)(A) to require regulation of *all* EGU HAP emissions upon finding that emissions of *one* HAP poses a health hazard, and *regardless* of whether it is appropriate or necessary to regulate all EGU HAP emissions.  *See* 76 FR 24976, 24989/1 (May 3, 2011)(JA14).  Moreover, EPA now interprets §112(n)(1)(A) to allow the decision whether it is "necessary" to regulate EGU emissions to be based solely on "environmental" impacts and "public welfare," even though these criteria are absent from §112(n)(1)(A).  *See, e.g.,* EPA Br. 45 n.15 ("[E]nvironmental effects may be considered as a primary criterion for

3

regulating EGUs, *even in the absence of a public health hazard*"), 37 ("[T]he Act plainly authorizes EPA to act to protect public health *and welfare*....") (emphases added).  Finally, EPA says it must regulate *all EGU HAP emissions* under §112(d) regardless of any health impact or the cost of regulation.  *See, e.g.,* EPA Br. 56.

Based on these interpretations, EPA promulgated emission standards for HAPs that it concedes have *not* been found to present health hazards.  These standards were established without evaluating whether that regulation was "appropriate and necessary" considering cost and other factors.  As discussed in State, Industry, and Labor Petitioners' Opening Brief ("Opening Br.") and developed further below, these linchpins of EPA's MATS rule cannot be reconciled with §112's language or structure.  Rejection of any of these new interpretations requires the rule to be set aside.

### 2.  Example of EPA's Regulatory Overreach: HCl Emissions.

The inconsistency between §112(n)(1)(A) and EPA's flawed interpretations is most evident in the regulation of hydrogen chloride ("HCl") emissions.[1] Nowhere does EPA claim that HCl emissions from EGUs pose *any* public health hazard.  Indeed, EPA's brief neglects to mention that HCl was evaluated and found

---

[1]   HCl is the surrogate for all HAP acid gases.

not to present a health hazard in the 1998 Utility Study and thereafter in 2000, 2004 and 2011.[2]

EPA attempts to justify its HCl emission limits in two ways. First, EPA re-defines the trigger for §112 EGU regulation to encompass environmental effects and justifies regulation *on that basis alone*. EPA Br. 14, 48-49. By contrast, in 2005 EPA did not consider the environmental impacts of any HAP emissions, including HCl, as the basis for triggering regulation.[3] This was entirely consistent with the statute because §112(n)(1)(A) directs EPA to address "hazards to public health" in determining whether regulation of an EGU HAP is "appropriate and necessary." It stands to reason that if a HAP like HCl poses no such hazard, regulation cannot be "necessary."

Moreover, regulation of EGU HCl emissions to address purported acidification of ecosystems (*see* EPA Br. 30) conflicts with Congress's 1990 decision to address acidification due to EGU emissions in an entirely new CAA title (Title IV). *See* §401. Under the plain language of §112(n)(1)(A) and

---

[2]     *See* EPA, Study of HAP Emissions from EGUs—Final Report to Congress, Vol. 1 at 6-3, 6-7 (Feb. 1998), EPA-HQ-OAR-2009-0234-3052 ("Utility Study")(JA550, JA554); 65 FR 79827/3(JA2615); 69 FR 4652, 4656 n.4, 4688 n.10 (Jan. 30, 2004)(JA2642, JA2674); 76 FR 25051/2(JA76).

[3]     EPA suggests that it considered environmental impacts in 2005 essentially as it does now. *See* EPA Br. 45-46 n.15. This is misleading. In 2005, EPA stated that environmental factors unrelated to public health could not trigger EGU regulation *in the absence of* health hazards. 70 FR 16002/3(JA2691).

historical reading of that provision, environmental effects cannot justify §112 regulation of an EGU HAP in the first instance; at most, they may be relevant to determining *how much* regulation is "appropriate."  EPA argues alternatively that an affirmative "appropriate and necessary" finding for any single HAP (e.g., mercury) *mandates* regulation of all EGU HAP emissions (including HCl) regardless of their health hazard.  EPA Br. 48, 56-62.  Nothing in §112(n)(1)(A) suggests that result, and EPA cites nothing in §112 to support its new regulatory approach.   Nor, as discussed *infra* at pp.12-13 and 16-17, does *National Lime* or *New Jersey* support such a result for EGUs.

### 3.  EPA's New Regulatory Approach Turns §112(n)(1)(A) on Its Head.

EPA admits, as it must, that Congress treated EGUs uniquely under §112. *See* EPA Br. 7.  This distinct treatment makes sense because EGUs are subject to other CAA programs that control HAP emissions.  EPA's new regulatory approach eliminates this distinct treatment of EGUs, and rejection of it for any of the reasons discussed below requires vacatur of the rule.

### a)     EPA Unlawfully Failed to Apply the §112(n)(1)(A) Decisional Criteria.

Various §112 provisions call for rulemaking to be conducted using specific decisional criteria.  For example, §112(d) establishes control technology criteria for MACT standards.  Section 112(f) establishes public health and environmental

criteria for addressing risks that remain after imposition of §112(d) standards. Section 112(m)(6) establishes a "necessary and appropriate" criterion for regulating atmospheric deposition to the Great Lakes and coastal waters to address "serious adverse effects to public health and serious or widespread environmental effects" remaining after regulation under "other provisions of [§112]." Section 112(n)(1)(A) establishes an "appropriate and necessary" criterion for regulating EGU HAP emissions to address "hazards to public health" remaining "after imposition of the requirements of this [Act]." These provisions provide different criteria for regulating *residual* risks from HAP emissions *after* imposition of §112 standards, in the case of (f) and (m), or *after* compliance with other requirements of the CAA, in the case of (n)(1)(A).

Similar to other §112 provisions addressing identified emissions, §112(n)(1)(A) contains decisional criteria for regulating EGU HAP emissions. Unlike §112(m)(6)'s "public health" and "environmental" triggers for regulation of risks that remain after imposition of §112 standards, however, only EGU HAP emissions posing "hazards to public health" that remain after "imposition of the requirements of this [Act]" trigger regulation under §112(n)(1)(A). *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001) ("[r]equisite" means "'sufficient, but not more than necessary'…to protect public health"). And unlike §112(d), "appropriate" and "necessary," *not* "MACT," is the regulatory decisional standard

7

under §112(n)(1)(A) and (m). Indeed, automatically regulating all EGU HAP emissions under §112(d) MACT standards could theoretically result in regulation that is either higher *or* lower than necessary to address health hazards.

That each of these §112 provisions prescribes different decisional criteria for HAP emissions regulation is confirmed by §307(d)(1)(C), which directs that rules under §§112(d), (f), (m) and (n) be developed using the rulemaking procedures of §307(d)(2)-(6). In these §112 provisions, Congress provided distinct decisional criteria for different sources and different emissions, and in each case required that those criteria be implemented through §307(d) rulemaking. Yet EPA argues that Congress's inclusion of §112(n) in §307(d) was a scrivener's error. *See* EPA Br. 34 n.9. On this basis, EPA claims that §307(d) cannot be read to demonstrate congressional intent that §112(n)(1)(A) provides independent regulatory authority for EGU HAP emissions.

While a court may read a statute contrary to its plain language "[i]f 'the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters,'" this Court has not done so "absent an extraordinarily convincing justification." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1041 (D.C. Cir. 2001).[4] Nothing about §307(d)(1)(C)'s reference to §112(n) is

---

[4] In *Appalachian Power*, the error rendered EPA's obligation under the relevant section utterly meaningless. *Id.* That is not the situation here.

demonstrably at odds with congressional intent.   As explained, §112(n) is no different from other §112 provisions referenced in §307(d)(1)(C), including §112(m), which uses an "appropriate" and "necessary" decisional criterion to address residual risks.

If EPA had conducted the MATS rulemaking using the §112(n) rulemaking criteria, as opposed to the §112(d) criteria, it would have developed emission standards only as "appropriate and necessary" to address only those EGU HAP emissions that present a health hazard.   EPA's failure to apply the §112(n) rulemaking criteria requires that this rule be set aside.

> **b)    EPA Unlawfully Rejected "Public Health Hazards" as the Sole Trigger for EGU Regulation.**

In §112(n)(1)(A), Congress recognized that regulation of EGU emissions under other CAA sections could reduce or eliminate health hazards from those emissions, making regulation under §112 unnecessary.   Congress therefore directed EPA to address any residual health hazards associated with EGU HAP emissions that remain "after imposition of the requirements of this [Act]." §112(n)(1)(A).   Congress did not make "environmental" effects a trigger, as in other §112 provisions.   *See, e.g.,* §112(n)(5) & (6) (directing EPA to consider hazards to "public health *and the environment*"), (b)(2) ("adverse human health effects…*or adverse environmental effects*"), (e)(2)(A) ("adverse effects…on

9

public health *and the environment*"), (m)(6) ("serious adverse effects to public

health *and serious or widespread environmental effects*") (emphases added).

According to EPA, §112(n)(1)(A)'s *silence* about environmental impacts

authorizes triggering of EGU regulation based solely on environmental effects.

*See* 76 FR 24988/2(JA13) (referenced at 77 FR 9304, 9325/1 (Feb. 16,

2012)(JA194)). But congressional silence does not confer discretionary regulatory

authority. As this Court has observed:

> To suggest, as the [agency] effectively does, that
> *Chevron* step two is implicated any time a statute does
> not expressly *negate* the existence of a claimed
> administrative power…, is both flatly unfaithful to the
> principles of administrative law and…refuted by
> precedent.

*Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995). While EPA attempts to

distinguish *Ethyl, see* EPA Br. 46 n.16, the Court's analysis there applies with

equal force here.

As in *Ethyl*, Congress in §112(n)(1)(A) prescribed what EPA was to

consider (public health hazards) and left no room for EPA to consider other

unspecified factors to trigger regulation. Moreover, "[a]nother telling indication

that the Administrator has misconstrued the meaning of [this] section…is the plain

language of…nearby provision[s]," e.g., §§112(n)(5)-(6), (b)(2), (e)(2)(A), and

(m)(6), "which explicitly instructs the Administrator to consider [the disputed

factor]." *Ethyl*, 51 F.3d at 1061. Omission of a term appearing in other statutory

provisions is a strong indication that Congress meant to exclude it. *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983). This is confirmed by §112(n)(1)(A)'s legislative history.[5] EPA's application of the wrong regulatory trigger requires that the rule be set aside.

c)    **EPA Violated §112(n)(1)(A) by Not Limiting EGU HAP Regulation to Only Those HAP Emissions Found to Pose a Health Hazard.**

Under §112(n)(1)(A), the Administrator is to regulate EGU HAP emissions if such regulation is "appropriate and necessary" after considering any "hazards to public health." EPA responds by arguing that the phrase "such regulation" is a cross-reference to §112(d)(1), which this Court has interpreted to require regulation of all HAPs *emitted by a* "*major source*," regardless of risk. *See* EPA Br. 60 n.23. EPA's argument conflicts with the language of §112(n)(1)(A), which requires EPA to find that regulation is "appropriate and necessary after considering the results of the [Utility] study" and evaluating whether "emissions" of HAPs by EGUs pose a residual health risk.

This conclusion is reinforced by other language in §112. For example, §112(n)(1)(A) requires EPA to devise "alternative control strategies for emissions

---

[5] 136 Cong. Rec. H12934 (daily ed. Oct. 26, 1990) (statement of Rep. Oxley), *reprinted in 1 1990 Legis. Hist.* at 1416(JA2865). Although EPA discounts Senator Oxley's statement (EPA Br. 50 n.19), he was the sponsor of this provision. Moreover, EPA previously relied on the very same statement to support its interpretation of §112(n)(1)(A). *See* 70 FR 16000/2(JA2691); Final EPA Br. at 113 n.42, *New Jersey v. EPA*, No. 05-1097 (D.C. Cir. July 23, 2007)(JA3308).

11

which may warrant regulation under this section."  If EPA were correct that §112 *requires* it to promulgate §112(d) standards for all EGU HAPs regardless of residual public health hazard, then identifying *alternative* control strategies (e.g., targeted regulation not authorized under §112(d)) is a pointless exercise.  Only if this requirement informs EPA's analysis of what regulation may be "appropriate" will the provision have meaning.

Similarly, the reference to "emissions which may warrant regulation" assumes that some emissions may *not* warrant regulation, just as identical language in §112(c)(3) requires EPA to identify only those HAP emissions from "area sources" that "warrant" §112(d) regulation.  EPA's argument that because the phrase describes the content of the Utility Study it "has no bearing on EPA's obligations" under §112(d) misses the point.  *See* EPA Br. 62 n.26.  EPA's obligations, and authority, to regulate EGU HAPs are grounded in §112(n)(1)(A), not §112(d), and §112(n)(1)(A) makes the Utility Study EPA's primary focus for deciding *whether* and *how* to regulate EGU HAP emissions.

*National Lime* does not support EPA's arguments that §112(n)(1)(A) requires regulation of all EGU HAP emissions or none.  *National Lime* addressed language in §112(d)(1), which required "promulgat[ion] [of] regulations establishing emission standards for [sources]…of hazardous air pollutants," and

concluded this language required MACT standards for all HAPs emitted by a "major source" in a source category listed under §112(c).  233 F.3d at 633.

By contrast, EGUs are regulated under §112(n)(1)(A) to the extent "appropriate and necessary" to address residual health hazards identified in the Utility Study.  This EGU-specific provision does *not* cross-reference §112(d)(1) or repeat the §112(d)(1) language on which *National Lime* relies.  Given the absence of a "clear statutory obligation to set emission standards for each listed HAP," *id.* at 634, and the clear statutory language limiting regulation of EGU HAPs as "appropriate and necessary," EPA cannot rely on *National Lime* to regulate *all* EGU HAP emissions after making an "appropriate and necessary" determination for one HAP emitted by EGUs.

This analysis finds support in a recent decision addressing §112(c)(6), a provision "designed for seven HAPs that Congress thought deserved special attention."  *Desert Citizens Against Pollution v. EPA*, 699 F.3d 524, 528 (D.C. Cir. 2012). This Court affirmed EPA's conclusion that it was unreasonable to read §112(c)(6) to regulate "a broad array of HAPs…at a §112(c)(6) source" simply because §112(c)(6) cross-references §112(d)(2).  *Id*.  Unlike §112(c)(6), §112(n)(1)(A) contains no cross-reference that could create ambiguity.  Instead, Congress explicitly directed EPA to regulate EGU HAP emissions *only* as "appropriate and necessary."

13

Finally, the plain language of §307(d)(1)(C) shows that §112(d) and §112(n) proceedings are separate, not overlapping, undertakings.  *See* §307(d)(1)(C) (listing rulemakings to which §307(d) procedures apply, and listing §112(d) and §112(n) separately).  If all §112(n) rulemaking proceedings require establishment of §112(d) standards, there is no reason to list them separately in §307(d).

### d) EPA Erred by Not Considering Costs in Determining the "Appropriate" Degree of Regulation.

According to EPA, once it determines that regulation of any EGU HAP emission is "necessary" to address a health hazard, regulation of all EGU HAP emissions must be "appropriate" regardless of cost.  EPA Br. 50-55.  EPA argues that its decision to disregard cost completely is a permissible interpretation of §112(n)(1)(A).  *See id*.  EPA's current interpretation is contrary to §112(n)(1)(A)'s terms and patently unreasonable.

As to the statute, EPA's view that it must regulate *all* EGU HAP emissions even if they pose no health hazard means that regulation can impose huge costs with no benefit.  This is precisely the case here, according to EPA's own analysis. Opening Br. 39-44.  If the statutory term "appropriate" imposes any limit on EPA regulation, it must at least limit regulation to "risks [that] are worth the cost of elimination."  *See Michigan v. EPA*, 213 F.3d 663, 677 (D.C. Cir. 2000) (addressing the term "significant").  This is consistent with the common sense

usage of the term "appropriate" to embody a host of considerations, including cost and environmental impacts.[6]  *See* Opening Br. 39.

Consistent with this common sense reading of "appropriate," EPA in 2005 recognized cost as a relevant factor.  *See* 70 FR 16000/3-01/1(JA2689-90).  EPA now offers three explanations for abandoning this reading.  First, EPA argues that *Michigan* allows, but does not compel, cost considerations in standard-setting.  EPA Br. 51 n.20.  *Michigan*, however, makes clear that cost is an essential factor in regulatory decision-making where the statute contains terms that indicate a balancing of competing considerations.  *Cf. Michigan,* 213 F.3d at 677-78 ("'[C]an an agency sensibly decide whether a risk is "significant" without also examining the cost of eliminating it?'").  As in *Michigan* with respect to the term "significant," EPA here "fail[s] to describe the intellectual process by which [it] would determine…[appropriateness] if it may consider only health."  *Id.* at 678.  Far from supporting EPA's §112 interpretation, *Michigan* demonstrates that EPA unreasonably excluded any cost consideration.

Second, EPA argues §112(c), (c)(9), and (d)(2) all prohibit considering cost.  *See* EPA Br. 53.  But nothing in §112(n)(1)(A) required EPA to regulate EGU

---

[6]  EPA mistakenly argues there is an inconsistency in Petitioners' treatment of "environmental impacts" and "cost."  *See* EPA Br. 47-48.  Petitioners have been entirely consistent:  cost and environmental impacts are relevant factors in determining the "appropriate" level of regulation, but not in triggering potential regulation, which must be based on health hazards alone.

HAP emissions under §112(c) and (d) in the first place.  Section 112(n)(1)(A) constrains EPA's authority to promulgate only "appropriate and necessary" regulation of EGU HAP emissions, and nothing in §112(c) or (d) vitiates the "appropriate" criterion expressly mandated by §112(n)(1)(A).

Finally, EPA argues that it may reasonably regulate EGU HAP emissions regardless of cost to address "hazards…that would otherwise go unaddressed." EPA Br. 54.  But nowhere in the MATS rule does EPA identify harmful HAP emissions that will "go unaddressed" if EPA considers the cost of addressing the harm.  While it may be a matter of discretion how much weight to give cost compared to other factors for a particular EGU HAP emission, cost cannot be completely ignored.

### 4. *New Jersey* Does Not Bar or Resolve Any of Petitioners' §112(n)(1)(A) Objections or Challenges to the Lawfulness of EPA's §112(d) Regulation.

In *New Jersey*, the parties addressed at length §112(n)(1)(A)'s restrictions on EPA's authority to regulate EGU HAP emissions.  The Court did not resolve any of those arguments but instead limited its opinion (and oral argument) to addressing EPA's authority to remove EGUs from the §112(c) list of "major" sources without first making the findings required for delisting under §112(c)(9).[7]

_____

[7] According to the Court, this provision also precluded EPA from removing a major source category from the §112(c)(1) list even upon finding that the listed

Thus, *New Jersey* only resolved EPA's delisting obligations. It did not evaluate the lawfulness of EPA's December 2000 §112(n)(1)(A) finding.

Perhaps the best illustration of this limited opinion is found in the Court's refusal to consider an argument (based on *Thomas v. New York*, 802 F.2d 1443, 1446-47 (D.C. Cir. 1986)) that EPA's December 2000 finding could have no binding legal effect under §112 and, therefore, that listing of EGUs could not trigger any regulation of EGU HAP emissions.[8] Because the Court refused to resolve issues related to the Administrator's authority and responsibilities under §112(n)(1)(A) and the lawfulness of EPA's regulation of EGUs under §112(d), these issues are ripe for review. *See, e.g., Nat'l Asphalt Pavement Ass'n v. Train*, 539 F.2d 775, 779 n.1 (D.C. Cir. 1976) (listing decisions under §111 are reviewed when EPA promulgates final standards).

## B. EPA's "Appropriate and Necessary" Determination Lacks Record Basis.

### 1. The Record Does Not Establish That Residual EGU Mercury Emissions Create a Health Hazard.

When EPA issued the December 2000 "notice of regulatory finding" on mercury emissions, it admitted that it could not quantify the amount of methylmercury in fish attributable to EGU emissions, 65 FR 79827/2-3(JA2615).

---

category was not major, a fact that would preclude listing in the first place. *New Jersey*, 517 F.3d at 582.

[8] *Id.* at 581 n.3; Opening Br. 27-28.

It logically follows that EPA did not know if its action would result in any change in methylmercury levels in fish. Both findings were necessary to determine whether EGU mercury emissions posed an actual health hazard.

Between December 2000 and 2005, EPA completed extensive data collection and modeling designed to quantify the impact of EGU mercury emissions, and on those bases, concluded that those emissions presented no health hazard in light of other CAA requirements. 70 FR 16015/2-16022/3(JA2704-11). As EPA concedes, coal-fired EGU mercury emissions have declined even more quickly as a result of other CAA regulations than EPA anticipated in 2005.[9]

Nevertheless, EPA now says that mercury emissions from coal-fired EGUs pose a health hazard because it projects that methylmercury exposures for the most sensitive individuals would exceed the reference dose ("RfD") for 29% of the waterbodies EPA has modeled. But, exceedance of an RfD does not establish a health hazard. Rather, as EPA has explained, a margin of safety (10-fold in the case of methylmercury) is built into the RfD, such that "[d]oses higher than the RfD may carry some risk, but because of the margin of safety, a dose above the RfD does not mean that an effect will necessarily occur." EPA, Toxicity Assessment, www.epa.gov/region8/r8risk/hh_toxicity.html(JA3344).

---

[9] In the proposed MATS rule, EPA estimated that mercury emissions from coal- and oil-fired EGUs totaled 29 tons, lower than the 38 tons EPA estimated in 2005. *Compare* 70 FR 16018 Table VI-3(JA2707) *with* 76 FR 25002/2(JA27).

To find a health hazard, EPA must address the significance of the risk that those exposures are projected to create. *See, e.g., NRDC v. EPA*, 824 F.2d 1146, 1153 (D.C. Cir. 1987) ("[S]omething is 'unsafe' only when it threatens humans with a 'significant risk of harm.'"). The record in this case shows that the RfD exceedances modeled by EPA involve only an insignificant, theoretical effect from mercury exposures (i.e., a hypothetical reduction of two one-thousandths of an IQ point for the most exposed, sensitive individuals).[10] EPA's RIA analysis thus supports its 2005 finding: there is no public health risk associated with current EGU mercury emissions. That those emissions continue to decline through imposition of other CAA requirements further undermines EPA's health hazard finding.

### 2. Non-Mercury Metals Do Not Pose a Health Hazard.

EPA's conclusion that EGU emissions of non-mercury metals create a health hazard rests on its "16-Plant Study."[11] That study's single goal was to identify

---

[10] EPA accuses Petitioners of conflating the Mercury Technical Support Document ("TSD") and EPA's Regulatory Impact Analysis ("RIA"). EPA Br. 39. Petitioners only cite what EPA itself has said. The Mercury TSD does not quantify the public health significance of the projected mercury levels in waterbodies. The RIA attempts to answer that question and finds essentially no IQ benefits. *See* EPA, RIA for Final MATS at 4-56 (Dec. 2011), EPA-HQ-OAR-2009-0234-20131(JA2356).

[11] EPA, Non-Hg Case Study Memo (Mar. 16, 2011), EPA-HQ-OAR-2009-0234-2939 ("16-Plant Study")(JA444) and EPA, Supplement to the Non-Hg Case Study Chronic Inhalation Risk Assessment (Nov. 2011), EPA-HQ-OAR-2009-0234-19912(JA1889). The study involved 15 coal-fired and one oil-fired EGUs.

those EGUs that might present off-site risks greater than one-in-one million,[12] and concluded that only four coal-fired plants presented risks slightly greater than one-in-one million.  EPA made no effort to explain why regulation of EGUs posing less than one-in-one million risk (virtually all of the industry) would be "warranted" to address a "public health" hazard, or why EPA's use of one-in-one million is the correct threshold in light of past EPA actions examining health risks, including EPA's §112(f) residual risk rulemaking.[13]    Nevertheless, under EPA's §112(n)(1)(A) interpretation, only plants posing risks greater than one-in-one million were relevant to EPA's §112(n)(1)(A) responsibilities.

As to the four plants with greater than one-in-one million risk, commenters explained that these risks were driven by unrealistic chromium contributions. Chromium risks calculated by EPA were an order of magnitude or more higher than risks calculated in all HAP risk assessments conducted in the past 15 years. Furthermore, EPA's chromium emission assumptions suggested that these plants, in several cases, were emitting more chromium after control than before.  *See* Utility Air Regulatory Group ("UARG") Comments 76 n.134 (Aug. 4, 2011),

---

[12] 16-Plant Study at 1 and 2 (EPA focused on "highest risk facilities based upon previous studies" and EGUs "with the highest emission rates of chromium and arsenic" from the information collection request ("ICR") testing)(JA444-45).

[13] *NRDC v. EPA*, 529 F.3d 1077, 1080 (D.C. Cir. 2008) (discussing the "100-in-one million" level for §112 residual risk regulation that EPA regarded as "the 'presumptively acceptable' level under its precedents").

EPA-HQ-OAR-2009-0234-17775(JA1478).   Commenters therefore reasoned that EPA's assumptions must have been driven by contaminated stack samples for these four plants.

EPA never meaningfully engaged these comments.  Rather than addressing why sampling values for the four plants were far out of line with all other plants tested and with all past assessments,  EPA's only response was to characterize the contamination comment as "speculat[ive]" and to suggest that the certifications filed by those conducting the testing justified EPA's unquestioning use of the values.[14]   In sum, EPA wholly failed to respond to these comments about its projected risks.  *See Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 443 & n.90 (D.C. Cir. 1980) (enforcing EPA duty to respond to significant comments); *Madison Gas & Elec. Co. v. EPA*, 25 F.3d 526, 527-28 (7th Cir. 1994) (determining EPA's cursory response to commenter concerns was wholly inadequate).  This failure to respond to comments is not a minor detail; it is EPA's entire basis for nudging the predicted health risk for four plants above the one-in-one million level, thereby subjecting *all* EGU HAP emissions to MACT standards.

Following promulgation of the MATS rule, UARG undertook retesting of the four plants.  UARG submitted these new tests, which followed the same testing

---

[14] EPA Br. 43-44.  Utilities had to certify that test results were accurately reported.  This does not mean that the test results were unaffected by contamination.

protocol as the prior ICR certification, in a §307(d) petition for reconsideration. The re-tests conclusively establish that EPA's modeled risks were greatly overstated due to sample contamination. UARG's modeling showed that realistic chromium values produce risk estimates for these four plants well below one-in-one million. UARG Reconsideration Petition 5-7 (Apr. 16, 2012), EPA-HQ-OAR-2009-0234-20179(JA2492-94). UARG's reconsideration petition has been pending before EPA for almost a year—two-and-a-half times longer than EPA took to review all rulemaking comments and promulgate the final MATS rule. If this Court believes that EPA's response to UARG's petition is necessary for the Court to resolve this challenge, the Court should remand the record and order EPA to act expeditiously on the petition. *Cf. Sierra Club v. Gorsuch*, 715 F.2d 653, 660-61 (D.C. Cir. 1983).

### 3. HCI Emissions Do Not Pose a Health or Environmental Hazard.

As Petitioners explained in their opening brief, HAP acid gas emissions do not pose a health hazard. EPA does not contest this fact. Instead, EPA finds it "appropriate and necessary" to regulate acid gas HAP emissions from EGUs because those emissions pose environmental risks. EPA Br. 48. As discussed above, this is not an adequate basis for triggering §112(n) regulation and, in any event, lacks record support.

In response, EPA summarily claims that "[p]ublished scientific research demonstrates that EGU acid gas emissions can exacerbate acidification effects already experienced in many sensitive ecosystems across the country." *Id*. The "published research" referred to by EPA, however, is a single study, *see* 76 FR 25013/2(JA38), on the effects of HCl deposition on waterbodies contained in United Kingdom peatlands. As commenters explained, that study's conclusions do not apply to EGU emissions in the U.S. because: (i) U.S. coals have substantially lower chlorine contents than U.K. coals, (ii) U.S. soils have different compositions than U.K. peatland soils, and (iii) chloride mobility observed in this single U.K. study cannot be generalized to all ecosystems. *See* EPRI Comments 3-47 (Aug. 4, 2011), EPA-HQ-OAR-2009-0234-17621(JA743). In addition, EPA never identifies the "sensitive ecosystems" it claims might be affected in the U.S., and fails to explain how acidification of any U.S. ecosystem can be severely affected by EGU HCl emissions that comprise only 0.7% of emissions with acidifying potential. *See id.* Nor does EPA ever address how this single U.K. study could have any bearing on the critical issue of whether the *amount* of acid gases emitted by any individual EGU poses any environmental risks.

23

## II.    ASSUMING EPA WAS COMPELLED TO ESTABLISH EGU STANDARDS UNDER §112(d), THE MATS RULE MUST BE VACATED BECAUSE EPA FAILED TO DISTINGUISH BETWEEN MAJOR AND AREA SOURCES.

Section 112(a) defines a "major source" as one that emits HAPs above a specific tonnage threshold, and an "area source" as one that is "not a major source."  Section 112(c)(1) then requires the Administrator to list "all categories and subcategories of major sources and area sources."  Area sources are to be "listed under" §112(c)(3), which provides criteria (in addition to the tonnage threshold) that the Administrator "shall" use for listing.  Having listed categories of major sources and categories of area sources, EPA is required under §112(d) to "promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources."

While EPA must establish MACT standards for listed major sources, area sources can be regulated in one of two ways under §112(d):  either MACT standards or an "alternative standard[]" that reflects use of "generally available control technologies [("GACT")]." §112(d)(5).  And while major sources are subject to MACT standards for each HAP emitted, *National Lime*, 233 F.3d at 633-34, area sources are subject to either MACT or GACT standards *only* for those HAPs that EPA finds "present[] a threat…warranting regulation."  §112(c)(3).  Under the plain language of §112, therefore, if EPA elects to establish MACT standards for both major sources and area sources, it must develop separate

24

standards for each based on (i) the different population of sources in the different source categories, and (ii) the different pollutants regulated under each category.

EPA admits that it ignored the distinction between major and area sources both in listing EGUs under §112(c) and in establishing §112(d) standards. EPA argues, nevertheless, that under the first step of *Chevron*, "once EGUs were listed pursuant to EPA's [December 2000] section [112(n)(1)(A)] determination, EPA was required to promulgate standards *consistent with the requirements of* [*§112(d)*]…." EPA Br. 57-58 (emphasis added). EPA's standards, however, were not consistent with §112(d).

Up to 42 percent of units that EPA used to establish the EGU MACT standard for each HAP were potential area source units; the remainder were major source units.[15] By defining performance using the composite of "best performing" sources taken from both major and area EGUs, EPA's MACT standards were established in a manner never authorized by Congress, resulting in more stringent standards for major sources than Congress ever contemplated. *See NRDC v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007) (vacating MACT standards set using the wrong universe of sources).

---

[15] EPRI's comments identified potential area sources. EPRI Comments, Appendix C(JA745-46). Petitioners constructed a table (JA2450-52) by comparing EPRI's list of area sources to the MACT floor data used by EPA for each HAP group, MACT Floor Analysis, Attachment a4, tab *fPM_avg_MMBtu,* Attachment a3, tab *HCl_Avg_MMBtu*, and Attachment a2, tab *Hg_Avg_>8300_Btulb_MMBtu* (Dec. 16, 2011), EPA-HQ-OAR-2009-0234-20132.

Alternatively, EPA argues that if its *Chevron* Step I argument is not accepted, *Chevron* Step II saves the rule. But if the statutory language saps EPA of *any* discretion to choose a different regulatory approach, as EPA argues here, *see* EPA Br. 65, EPA's rule cannot possibly reflect a "reasonable" exercise of the very discretion EPA says it lacks. Either §112(n)(1)(A) directs EPA to regulate only those EGU HAP emissions that pose "public health" hazards under an "appropriate and necessary" rulemaking standard (as Petitioners argue), or §112(c) and (d) establish a plain meaning path for regulation of EGU emissions that EPA has not followed. Under either interpretation, EPA's MATS standards must be set aside.

Recognizing its *Chevron* Step I argument vanishes under the statutory language governing listing area sources under §112(c)(3) and regulating them under §112(d), EPA suggests these provisions do not apply to EGUs. According to EPA, because §112(n)(1)(A) authorizes EPA to regulate EGUs (as defined in §112(a)(8)) *regardless* of whether they are major or area sources, §112(c)(3) is "superfluous" for EGUs. EPA Br. 64. EPA is wrong.

EGUs are defined in §112(a) to determine the applicability of §112(n)(1)(A), just as "major" and "area" sources are defined in §112(a) to determine the applicability of §112(c) and (d). Each defined term ("EGU," "major source," and "area source") can be given effect without reading any statutory provision out of the CAA as "superfluous." Because, according to EPA, §112(n)(1)(A) imposes no

26

obligation on EPA to identify EGU HAP emissions that *do not* "*warrant*" regulation, *see supra* pp.11-13, §112(c)(3) becomes the only provision in §112 requiring EPA to identify HAP emissions that *do not* "warrant[] regulation." As a result, §112(c)(3) is not "superfluous," if §112(c) and (d) govern EGU standard-setting as EPA argues. Section 112(c)(3) determines which HAPs will be subject to area source regulation; section 112(d)(2), as construed in *National Lime*, 233 F.3d 625, determines which HAPs are subject to major source MACT.[16]

EPA next argues that it could reject GACT standards for EGU area sources because they have "'similar…emissions and [similar] control technologies'" to major sources. EPA Br. 66 (quoting 77 FR 9438/2). This proves too much. Any listed "area" source category has emissions similar to those of the comparable "major" source category. Emissions are just lower. Acceptance of EPA's rationale would require rejection of GACT in every area source rulemaking, rendering the provision meaningless.

Finally, even if EPA is correct that area sources with higher mercury emissions should be regulated under MACT rather than GACT, EPA Br. 66, EPA has cited no other EGU HAP emission "warranting" such regulation under §112(c)(3). Thus, even accepting EPA's view that §112(n) does not provide the

---

[16] On the other hand, if Petitioners' construction of §112(n)(1)(A) is correct, §112(c)(3) is simply irrelevant, because §112(n)(1)(A) provides the sole decisional criteria for regulating EGUs.

decisional criteria for regulating EGU HAPs, EGU area source regulation could have been no broader than mercury emissions.

## III. ASSUMING §112(c) AND (d) GOVERN REGULATION OF EGU HAP EMISSIONS, EPA'S MACT STANDARDS ARE UNLAWFUL.

### A. EPA's Mercury MACT Limits Are Arbitrary and Capricious.

In setting a MACT floor under §112(d)(3), EPA must determine the best performing 12% of existing units in a category.  To determine the EGU MACT floor for HCl, non-mercury metals, and mercury,  EPA identified, out of the approximately 1100 units in the industry, approximately 170 low-emitting, well-controlled coal-fired EGUs for each pollutant for ICR testing (i.e., about 15% of the industry).[17]  For the HCl and non-mercury metals MACT floors, EPA identified, from the ICR testing, the best performing 12% of all units (i.e., 131 of 170).  For mercury, however, EPA abandoned this approach after ICR testing.

The mercury MACT floor was based on a population of units comprising (1) the ICR tested units, and (2) other units with historic data.  From this population of under 400 units (approximately a third of all units), EPA selected the 12% "best performers" (i.e., 40 units).  Because the sub-population EPA used to establish the floor included the 15% of all units believed to be best performers (e.g., the 170 ICR tested units), the MACT floor was based on best performing

---

[17] EPA, Response to Comments on Proposed ICR 27 (Nov. 5, 2009), EPA-HQ-OAR-2009-0234-0063(JA397).

units representing less than 4% of all units, or stated differently, the floor was based on the "best" (i.e., top third) of the 12% "best performers" in the category.

In the preamble to the proposal, EPA's sole justification for treating the ICR mercury data differently from ICR data on other HAP emissions was to deny that the units selected for ICR testing were the best performing sources for mercury. Commenters responded that EPA's denial was contradicted by EPA's statements to the Office of Management and Budget ("OMB") justifying the mercury ICR. UARG Comments 88(JA1485). Moreover, evidence that the ICR tested units were the best performing ones showed: (1) a disproportionately high percentage of ICR tested units had effective mercury control equipment,[18] (2) the average mercury emissions of the tested units were 39% lower than that of the historic data, and (3) virtually all units used to calculate the MACT floor pool were ICR tested units. *See* UARG Comments 90-92(JA1487-89).

In the final rule, EPA did not dispute that, if the ICR tested units were the lowest-emitting units in the category, it could not justify the MACT floor selected. EPA continued to insist, however, that best performing units were not

---

[18]  In its brief, EPA maintains that the fact that 73% of plants equipped with activated carbon injection ("ACI") were required to conduct ICR testing is not indicative of EPA's targeting the best performers for testing. EPA Br. 73 n.36. But basic statistics contradicts EPA's claim. Choosing 73% of all units equipped with ACI for ICR testing when those units comprise only 15% of all units is not a fortuitous happenstance. It was a deliberate choice.

29

disproportionally sampled.  In doing so, EPA simply repeated its denial of any bias in selection, characterized its earlier representations to OMB as in error, and ignored comments that confirmed the low emissions bias in ICR unit selection.  In other words, all EPA had to say in promulgating the final mercury MATS was: "That's my story and I'm sticking to it."[19]  This hardly satisfies reasoned decision making.

### B. EPA's Decision Not to Set §112(d)(4) Standards Is Arbitrary and Capricious.

Section 112(d)(4) authorizes EPA to set alternative standards if those standards will protect health "with an ample margin of safety."  In the final rule, EPA declined to issue health-based limits for HCl because of "information gaps." EPA Br. 88.

During the rulemaking, however, commenters pointed EPA to extensive health-based analyses and data, including EPA's 1998 Utility Study and its 16-Plant Study.   UARG Comments 116-17(JA1494-95); Southern Company Comments 143 (Aug. 4, 2011), EPA-HQ-OAR-2009-0234-18023(JA1685).   In addition, commenters provided an EPRI study,[20] which modeled *every* U.S. coal-fired EGU, that confirmed public exposures to HCl emissions from EGUs were all

---

[19] Collin Raye, "That's My Story."

[20] EPRI, Updated HAPs Emissions Estimates and Inhalation Human Health Risk Assessment for U.S. Coal-Fired EGUs (2011 revision), EPA-HQ-OAR-2009-0234-16738(JA659).

below the reference concentration ("RfC") level that EPA defines as being without appreciable risk of deleterious effects over a lifetime.   UARG Comments 117-18(JA1495-96).

EPA now asserts that if there is any "fault" in EPA's refusal to consider §112(d)(4) standards in the final rule, the "fault lies not with EPA."  EPA Br. 89. But this excuse is rebutted on its face by the commenters' submissions that provided the necessary information and a methodology for developing §112(d)(4) standards.   EPA's refusal to consider health-based standards in the face of uncontested information that EGU acid gas HAP emissions were *well* below EPA's own health-protective threshold, *see, e.g.,* Opening Br. 53, 62, is arbitrary and capricious.

## C. EPA's Denial of UARG's Delisting Petition Lacks Basis.

In response to UARG's delisting petition, EPA cites *NRDC v. EPA,* 489 F.3d at 1373, for the proposition that §112(c)(9) only permits delisting of source categories, not subcategories.   EPA Br. 63.   In its December 2000 notice of finding, however, EPA found that regulation of gas-fired EGUs under §112 was neither "appropriate" nor "necessary."  65 FR 79826/1(JA2614).  Nothing prevents EPA from likewise deciding that coal-fired EGUs should not be regulated under §112.

31

EPA is also wrong in asserting that UARG failed to demonstrate that coal-fired EGUs meet the §112(c)(9) delisting criteria. *See* EPA Br. 62-63. UARG's delisting petition included inhalation pathway modeling that addressed HAP emissions from every U.S. coal-fired EGU. That modeling showed that no plant exceeded a risk of one-in-one million. EPA's attempt to dismiss that portion of UARG's delisting petition with the 16-Plant Study is fatally flawed, for the reasons discussed above. *See supra* p.19-22. EPA also attempts to dismiss UARG's petition by citing a single result in UARG's extensive multi-pathway modeling as having a risk greater than one-in-one million, and also claiming that UARG failed to model the worst-case scenario. *See* 77 FR 9365/1(JA234). In fact, UARG's petition identified numerous, compounding conservatisms in the multi-pathway modeling, which EPRI explained would likely lead to over-prediction of risk.[21] As a result, EPRI's multi-pathway modeling approach was appropriate and followed EPA's guidelines, and satisfied §112(c)(9).[22] At a minimum, EPA cannot simply dismiss this highly conservative multi-pathway modeling analysis without addressing EPRI's conclusion that the conservatisms in its analysis meant there

---

[21] UARG, De-Listing Petition at 12 (Aug. 4, 2011), EPA-HQ-OAR-2009-0234-17777(JA1532).

[22] In footnote 27 of its brief, EPA asserts that its guidance memorandum on delisting petitions is not a regulation and does not have legal force. But the footnote fails to explain that EPA staff gave this memorandum to UARG and instructed UARG to follow it.

was no possibility of *any* individual exposure pathway having risk greater than one-in-one million.   For these reasons, UARG's delisting petition should be remanded for further consideration.

## CONCLUSION

For the foregoing reasons, the Court should vacate the MATS rule.

Dated: April 8, 2013                          Respectfully submitted,

/s/ F. William Brownell                            /s/ Neil D. Gordon
F. William Brownell                          Bill Schuette
Lauren E. Freeman                           ATTORNEY GENERAL
Lee B. Zeugin                               John J. Bursch
Elizabeth L. Horner                         Solicitor General
HUNTON & WILLIAMS LLP                        S. Peter Manning
2200 Pennsylvania Avenue, N.W.              Neil D. Gordon
Washington, D.C. 20037                      Brian J. Negele
(202) 955-1500                              Assistant Attorneys General
bbrownell@hunton.com                        Environment, Natural Resources, and
lfreeman@hunton.com                         Agriculture Division
lzeugin@hunton.com                          Office of the Attorney General of
ehorner@hunton.com                          Michigan
                                            525 W. Ottawa Street
*Counsel for Utility Air Regulatory*        P.O. Box 30755
*Group*                                     Lansing, MI  48909
                                            (517) 373-7540
                                            manningp@michigan.gov
                                            gordonnl@michigan.gov
                                            negeleb@michigan.gov

                                            *Counsel for the State of Michigan*

33

 /s/ Peter S. Glaser

Peter S. Glaser
George Y. Sugiyama
TROUTMAN SANDERS LLP
401 Ninth Street, N.W.
Suite 1000
Washington, D.C.  20004
(202) 274-2998
peter.glaser@troutmansanders.com

*Counsel for National Mining
Association*

 /s/ David B. Rivkin, Jr.

David B. Rivkin, Jr.
Lee A. Casey
Mark W. DeLaquil
Andrew M. Grossman
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5304
(202) 861-1500
drivkin@bakerlaw.com
lcasey@bakerlaw.com
mdelaquil@bakerlaw.com
agrossman@bakerlaw.com

*Counsel for National Black Chamber of
Commerce and Institute for Liberty*

 /s/ Luther Strange

Luther Strange
ATTORNEY GENERAL
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7445

*Counsel for the State of Alabama*

 /s/ Steven E. Mulder

Michael C. Geraghty
ATTORNEY GENERAL
Steven E. Mulder
State of Alaska
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501-1994

*Counsel for the State of Alaska*

/s/ David M. Flannery
David M. Flannery
Gale Lea Rubrecht
Kathy G. Beckett
Edward L. Kropp
JACKSON KELLY PLLC
500 Lee Street, East, Suite 1600
P.O. Box 553
Charleston, WV  25322-0553
(304) 340-1000
dmflannery@jacksonkelly.com
galelea@jacksonkelly.com
kbeckett@jacksonkelly.com
skropp@jacksonkelly.com

*Counsel for Midwest Ozone Group*

/s/ Joseph P. Mikitish
Thomas Horne
ARIZONA ATTORNEY GENERAL
Joseph P. Mikitish
James T. Skardon
Assistant Attorneys General
Environmental Enforcement Section
1275 West Washington
Phoenix, AZ 85007
(602) 542-8553
Joseph.mikitish@azag.gov

*Counsel for the State of Arizona*

/s/ Leslie Sue Ritts
Leslie Sue Ritts
RITTS LAW GROUP, PLLC
The Carriage House
620 Fort Williams Parkway
Alexandria, VA 22304
(703) 823-2292
LSRitts@rittslawgroup.com

*Counsel for American Public Power
Association*

/s/ Kendra Akin Jones
Dustin McDaniel
ARKANSAS ATTORNEY GENERAL
Kendra Akin Jones
Assistant Attorney General
Charles L. Moulton
Senior Assistant Attorney General
Arkansas Attorney General
323 Center Street, Suite 400
Little Rock, AR  72201
(501) 682-2007
kendra.jones@arkansasag.gov
charles.moulton@arkansasag.gov

*Counsel for the State of Arkansas, ex
rel. Dustin McDaniel, Attorney General*

/s/ Peter S. Glaser

Peter S. Glaser
George Y. Sugiyama
TROUTMAN SANDERS LLP
401 Ninth Street, N.W.
Suite 1000
Washington, D.C.  20001
(202) 274-2998
peter.glaser@troutmansanders.com

*Counsel for Peabody Energy
Corporation*

/s/ Jonathan A. Glogau

Pamela Jo Bondi
ATTORNEY GENERAL OF FLORIDA
Jonathan A. Glogau
The Capitol, PL-01
Tallahassee, FL 32399-1050

*Counsel for the State of Florida*

36

/s/ David M. Flannery

David M. Flannery
Gale Lea Rubrecht
Kathy G. Beckett
Edward L. Kropp
JACKSON KELLY PLLC
500 Lee Street, East, Suite 1600
P.O. Box 553
Charleston, WV  25322-0553
(304) 340-1000
dmflannery@jacksonkelly.com
galelea@jacksonkelly.com
kbeckett@jacksonkelly.com
skropp@jacksonkelly.com

*Counsel for West Virginia Chamber of
Commerce, Inc., Georgia Association of
Manufacturers, Inc., Indiana Chamber
of Commerce, Inc., Indiana Coal
Council, Inc., Kentucky Chamber of
Commerce, Inc., Kentucky Coal
Association, Inc., North Carolina
Chamber, Ohio Chamber of Commerce,
Pennsylvania Coal Association, South
Carolina Chamber of Commerce, The
Virginia Chamber of Commerce, The
Virginia Coal Association,
Incorporated, West Virginia Coal
Association, Inc., and Wisconsin
Industrial Energy Group, Inc.*

/s/ Lawrence G. Wasden

Lawrence G. Wasden
IDAHO ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720-0010

*Counsel for the State of Idaho*

/s/ Eugene M. Trisko
Grant Crandall
Arthur Traynor, III
UNITED MINE WORKERS OF AMERICA
18354 Quantico Gateway Drive
Suite 200
Triangle, VA  22172
(703) 291-2457
gcrandall@umwa.org
atraynor@umwa.org

Eugene M. Trisko
LAW OFFICES OF EUGENE M. TRISKO
P.O. Box 47
Glenwood, MD  21738
(301) 639-5238
emtrisko@earthlink.net

*Counsel for United Mine Workers of America*

/s/ Valerie Tachtiris
Gregory F. Zoeller
INDIANA ATTORNEY GENERAL
Valerie Tachtiris
Deputy Attorney General
Office of the Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204
(317) 232-6290
Valerie.Tachtiris@atg.in.gov

*Counsel for the State of Indiana*

/s/ Dennis Lane

Dennis Lane
STINSON MORRISON HECKER LLP
1775 Pennsylvania Ave., N.W.
Suite 800
Washington, D.C.  20006-4605
(202) 785-9100
dlane@stinson.com

Parthenia B. Evans
STINSON MORRISON HECKER LLP
1201 Walnut Street, Suite 2900
Kansas City, MO  64106
(816) 842-8600
pevans@stinson.com

*Counsel for Kansas City Board of
Public Utilities*

/s/ Jeffrey A. Chanay

Derek Schmidt
ATTORNEY GENERAL OF KANSAS
Jeffrey A. Chanay
Deputy Attorney General, Civil
Litigation Division
Office of the Attorney General of
Kansas
120 SW 10th Avenue, 3rd Floor
Topeka, KS  66612-1597
(785) 368-8435
jeff.chanay@ksag.org

Henry V. Nickel
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500
hnickel@hunton.com

George P. Sibley, III
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA  23221
(804) 788-8200
gsibley@hunton.com

*Counsel for the State of Kansas*

/s/ Eric A. Groten

Eric A. Groten
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX  78746-7568
(512) 542-8709
egroten@velaw.com

Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C.  20037-1701
(202) 639-6507
jmarwell@velaw.com

*Counsel for White Stallion Energy
Center, LLC*

/s/ Harold E. Pizzetta III

Harold E. Pizzetta III
ASSISTANT ATTORNEY GENERAL
Director, Civil Litigation Division
550 High Street, Suite 1100
P.O. Box 220
Jackson, MS  39205-0220
(601) 359-3816
hpizz@ago.state.ms.us

*Counsel for the State of Mississippi*

/s/ John A. Riley

John A. Riley
Christopher C. Thiele
BRACEWELL & GIULIANI LLP
111 Congress Avenue, Suite 2300
Austin, TX  78701-4061
(512) 542-2108
john.riley@bgllp.com
chris.thiele@bgllp.com

*Counsel for Chase Power Development,
LLC*

/s/ James R. Layton

Chris Koster
ATTORNEY GENERAL
James R. Layton
John K. McManus
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800
James.Layton@ago.mo.gov

*Counsel for the State of Missouri*

40

/s/ Paul D. Clement

Paul D. Clement
Nathan A. Sales
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C.  20036
(202) 234-0090
pclement@bancroftpllc.com
nsales@bancroftpllc.com

*Counsel for FirstEnergy Generation Corporation*


/s/ Lisa Marie Jaeger

Lisa Marie Jaeger
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, D.C.  20006-1872
(202) 828-5800
lisa.jaeger@bgllp.com

*Counsel for Edgecombe Genco, LLC and Spruance Genco, LLC*


/s/ Katherine J. Spohn

Jon Bruning
ATTORNEY GENERAL OF THE STATE OF NEBRASKA
Katherine J. Spohn
Deputy Attorney General
2115 State Capitol
PO Box 98920
Lincoln, NE 68509
(402) 471-2682
Katie.spohn@nebraska.gov

*Counsel for the State of Nebraska*


/s/ Margaret I. Olson

Wayne Stenehjem
ATTORNEY GENERAL
State of North Dakota
Margaret I. Olson
Assistant Attorney General
Office of Attorney General
500 North 9th Street
Bismarck, ND  58501-4509
(701) 328-3640
maiolson@nd.gov

*Counsel for the State of North Dakota*

41

/s/ Steven C. Kohl
Steven C. Kohl
Eugene E. Smary
Sarah C. Lindsey
WARNER NORCROSS & JUDD LLP
2000 Town Center, Suite 2700
Southfield, MI  48075-1318
(248) 784-5000
skohl@wnj.com

*Counsel for Wolverine Power Supply
Cooperative, Inc.*


/s/ E. Scott Pruitt
E. Scott Pruitt
OKLAHOMA ATTORNEY GENERAL
P. Clayton Eubanks
Deputy Solicitor General
Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK  73105
(405) 522-8992
fc.docket@oag.ok.gov
clayton.eubanks@oag.ok.gov

*Counsel for the State of Oklahoma*

/s/ Dale T. Vitale
Michael DeWine
ATTORNEY GENERAL OF OHIO
Dale T. Vitale
Gregg H. Bachmann
Cameron F. Simmons
Assistant Attorneys General
Environmental Enforcement Section
30 E. Broad St., 25th Floor
Columbus, OH  43215-3400
(614) 466-2766
dale.vitale@ohioattorneygeneral.gov

*Counsel for the State of Ohio*


/s/ Robert M. Wolff
James D. Schultz
GENERAL COUNSEL
Gregory E. Dunlap
Executive Deputy General Counsel
Robert M. Wolff
Special Counsel
Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA  17101
(717) 783-6563

*Counsel for the Commonwealth of
Pennsylvania*

42

/s/ James Emory Smith, Jr.

Alan Wilson
ATTORNEY GENERAL
James Emory Smith, Jr.
Assistant Deputy Attorney General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
(803) 734-3680
agesmith@scag.gov

*Counsel for the State of South Carolina*

/s/ Mark Walters

Greg Abbott
ATTORNEY GENERAL OF TEXAS
Daniel T. Hodge
First Assistant Attorney General
John B. Scott
Deputy Attorney General for Civil
Litigation
Jon Niermann
Chief, Environmental Protection
Division
Mark Walters
Assistant Attorney General
Mary E. Smith
Assistant Attorney General
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2012
mark.walters@texasattorneygeneral.gov
mary.smith@texasattorneygeneral.gov

*Counsel for the State of Texas, Texas
Commission on Environmental Quality,
Texas Public Utility Commission, and
Railroad Commission of Texas*

/s/ Mark L. Shurtleff

Mark L. Shurtleff
UTAH ATTORNEY GENERAL
350 North State Street, #230
Salt Lake City, UT 84114-2320
(801) 538-1191

*Counsel for the State of Utah*

/s/ Kenneth T. Cuccinelli, II

Kenneth T. Cuccinelli, II
ATTORNEY GENERAL OF VIRGINIA
900 East Main Street
Richmond, VA 23219
(804) 786-7240

*Counsel for the Commonwealth of
Virginia*

/s/ Silas B. Taylor
Patrick Morrisey
ATTORNEY GENERAL OF WEST VIRGINIA
Silas B. Taylor
Senior Deputy Attorney General
Office of the West Virginia Attorney
General
State Capitol, Room 26-E
Charleston, WV 25305
(304) 558-2021
sbt@wvago.gov

*Counsel for the State of West Virginia*

/s/ Brenna Findley
Brenna Findley
1007 East Grand Avenue
Des Moines, IA 50319
brenna.findley@iowa.gov

*Counsel for Terry E. Branstad,*
*Governor of the State of Iowa on behalf*
*of the People of Iowa*

/s/ Jeffrey R. Holmstead
Jeffrey R. Holmstead
Sandra Y. Snyder
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, D.C. 20006-1872
(202) 828-5800
jeffrey.holmstead@bgllp.com
sandra.snyder@bgllp.com

*Counsel for Tri-State Generation and*
*Transmission Association, Inc.*

/s/ Jay A. Jerde
Gregory A. Phillips
WYOMING ATTORNEY GENERAL
Jay A. Jerde
Wyoming Deputy Attorney General
Office of the Attorney General of
Wyoming
123 State Capitol
Cheyenne, WY 82002
(307) 777-7841
jay.jerde@wyo.gov

*Counsel for the State of Wyoming*

/s/ Jack Conway
Jack Conway
ATTORNEY GENERAL OF KENTUCKY
Commonwealth of Kentucky
700 Capital Avenue, Suite 118
Frankfort, KY 40601

*Counsel for Jack Conway, Attorney*
*General of Kentucky*

/s/ Katherine L. Vaccaro
Bart E. Cassidy
Katherine L. Vaccaro
MANKO, GOLD, KATCHER & FOX, LLP
401 City Avenue, Suite 500
Bala Cynwyd, PA 19004
(484) 430-5700
bcassidy@mgkflaw.com
kvaccaro@mgkflaw.com

*Counsel for ARIPPA*

44

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Circuit Rules 32(a)(1) and 32(a)(2)(C), I hereby certify that the foregoing Joint Reply Brief of State, Industry, and Labor Petitioners in final form contains 7,224 words, as counted by a word processing system that includes headings, footnotes, quotations, and citations in the count, and therefore is within the word limit set by the Court.


 Dated: April 8, 2013                                    /s/ F. William Brownell

## CERTIFICATE OF SERVICE

I hereby certify that, on this 8th day of April 2013, a copy of the Joint Reply

Brief of State, Industry, and Labor Petitioners in final form was served

electronically through the Court's CM/ECF system on all ECF-registered counsel.

/s/ F. William Brownell